Campbell, Chief Justice,
delivered the opinion of the court.
The plaintiff relies upon an alleged express contract, which she claims was made between her decedent, Gathmann, and the Government, whereby the latter became bound to pay Gathmann a stipulated amount per pound of smokeless powder dried by Gathmann’s method. It is averred that the Government subsequently dried large quantities of smokeless powder by the use of that method.
The facts show that Gathmann and Admiral O’Neil, the Chief of Ordnance, United States Navy, were well acquainted; that they held frequent conversations relative to ordnance matters at different times during a period of five or six years prior to the date of the correspondence to be stated; that Gathmann was an inventor, and, among other things, had become interested in the subject of a drying process for smokeless powder. Naturally such a subject engaged the attention of the Chief of Ordnance. It appears that the grains of smokeless powder are formed by forcing a plastic mass of material, constituting the powder, through dies and cutting into short pieces the macaronilike strings which result from the forcing process. The material is in a plastic condition, or mass, because of the presence therein of an excessive amount of ether and alcohol. These elements — ether arid alcohol — are called the “ solvent.” As the powder in its plastic condition comes from the dies it contains about 40 per cent of the solvent, and this percentage must be reduced to between 4 and 7 per cent, according to the caliber, before the powder is ready for use. When the material is newly made or “ green ” the solvent begins to evaporate and is given off more rapidly than is the case after the evaporation has gone on for a time.
The ether and alcohol being expensive it is desirable to save as much of them as possible for further use. The defendant had been using one or more methods for recover *313 ing the solvent which were not satisfactory. It also used a method of drying which took a long time. Gathmann claimed to have discovered a process whereby' the solvent could be saved, the time of drying greatly reduced, and thus combine into one process the two methods mentioned. He discussed his plans with the chief of bureau, who became interested in the suggestion and indicated a willingness to have the Gathmann method tested. At that time Gathmann had filed in the Patent Office his application for letters patent for “Improvement in Methods of Drying Materials.”
As a result of the discussions between Gathmann and the chief of bureau, and especially the suggestion by the former that his method would greatly reduce the time for drying powder, and the indicated willingness of the bureau to test the process, Gathmann wrote and delivered to Admiral O’Neil, as Chief of the Bureau of Ordnance, a letter reading as follows:
“ Sie : The undersigned has made an invention, ‘ Method of drying materials,’ for which patent has been filed Feb. 9, 1903, Series No. 142653. Now, in consideration of the Navy Department building an apparatus for testing this method, without expense to me, I hereby give the Navy Department the option of using my method of drying materials, if they find it to their advantage, by paying to toe, my heirs, or my legal representatives $0.01 (one cent) for each pound of material dried by my method.”
At the time the letter was delivered Gathmann also delivered to Admiral O’Neil a plan or drawing for the testing apparatus. Gathmann’s letter was dated March 24, 1903, and in reply to it the Chief of Bureau of Ordnance caused to be delivered to Gathmann a letter dated March 26, 1903, reading as follows:
“ Sir: Referring to your communication, of March 24, 1903, offering the Navy Department the option of using your method of drying materials, on payment of one cent per pound on materials so dried, the bureau has to inform you that it accepts your proposition and has ordered one experimental apparatus for’ drying smokeless powder constructed in accordance with plan submitted by you. This apparatus will be tested without expense to you, and, if it works satisfactorily to the bureau, the bureau agrees to pay you, your heirs, or legal representatives one cent for each *314 pound of smokeless powder dried by the method covered by Íour application or applications filed or to be filed with the I. S. Patent Office, provided a patent or patents is or are issued to you therefor.”
In the original petition in this case, brought in the name of Gathmann and sworn to by him, it is stated that the drawing for an experimental apparatus, which he caused to be delivered to the Chief of the Bureau of Ordnance, was the same drawing which he had filed February 9, 1903, with his application for the patent above described. At any rate, in pursuance of the statements in Admiral O’Neil’s letter, stops were taken to make a suitable test of the proposed method. The Government, under the direction of Gath-mann, at its own expense constructed and tested at its powder plant at Indianhead the experimental apparatus and method which Gathmann had proposed. The experiment was exhaustive and in making it there were adopted all of the suggestions made by Gathmann except one, which was that after the experiments had continued for some time and were not producing the expected results Gathmann desired the apparatus to be operated continuously, but the Government declined to operate on Sundays and holidays because of the increased expense. Except this feature, all of Gathmann’s suggestions were complied with. These experiments extended over a period of about a year, and a report was finally made to the department upon the results of the same.
Following this report the Bureau of Ordnance notified Gathmann under date of October 14, 1904, as follows:
“Referring to your apparatus for drying powder, installed at the naval proving ground for trial: The bureau forwards herewith a copy of the report made by the inspector of ordnance in charge of that station for your information. After carefully considering this report the bureau is of the opinion that this apparatus has failed to demonstrate anything that would warrant further experiment with it, and the bureau has instructed the inspector of ordnance in charge of the naval proving ground that, when the drier can hold no more samples, the whole amount be put in the dryhouse until dried to the proper volatiles.”
Suit was brought in this court by petition, filed in the name of the said Gathmann, on April 17, 1915, more .than *315 ten years after the department’s action in declining the proposal. An amended petition was filed July 31, 1919, in the name of the administratrix of Gathmann.
The alleged contract is predicated, in the original and amended petitions, upon the letter of Gathmann, dated March 24,1903, and the reply thereto of the Chief of Bureau of Ordnance dated March 26, 1903.
It is manifest that the report to Gathmann of October, 1904, is an essential part of the transaction between the parties. The substance of this correspondence is that Gath-mann, claiming to hare invented a useful method of drying material, proposed to give the Navy Department “ the option of using my method of drying materials if they find it to their advantage” in consideration of the department building an apparatus for testing without expense to him, and if found to its advantage and used by it upon paying him a stated sum per pound of material dried by his method. The reply of the department refers to the fact of Gathmann’s “offering the Navy Department the option of using” his method, and informs him that it accepts his proposal, and had ordered an experimental apparatus constructed in accordance with the plan submitted by him, and it is significantly added: “This apparatus will be tested without expense to you, and if it works satisfactorily to the bureau ” the latter agreed to pay one cent per pound for powder driéd by Gathmann’s method. Subsequently, after a long and thorough test, the bureau informed him that the apparatus had failed to demonstrate anything that would warrant-further experiment. There was inclosed to him a copy of the report made by the inspector of ordnance in charge of the station.
Clearly this correspondence does not amount to a contract between the Government and Gathmann. At most, a mere option was granted by Gathmann to the Government to use his method if found suitable after making a test of' certain apparatus furnished by him, which he continued to improve or change. The Government, having made these experiments, notified him that his process was not satisfactory. His offer having been thus rejected, the option was at an end. The action here is. fO-recover for an alleged use of the method beginning nearly five years after the rejection of *316 the option. True it is that the plaintiff appears willing to accept payment on the basis of the original, .but rejected, proposition, one cent per pound, but manifestly, if instead of claiming a contract the suit were for an infringement and plaintiff sought such amount as could be proven as damages the correspondence above mentioned would not protect the Government or limit the recovery to one cent per pound. There was never any agreement between the parties to use Gathmann’s method, and all we have is, as has been stated, an option granted, declined, and terminated.
The instant case illustrates the importance of determining whether in fact a contract was made between the parties, because if one was made the court is not concerned with the. question of the validity of the patent. When it is found that the defendant agreed to use a patented method or process, and did use it, the amount agreed upon as royalty becomes payable. But even in the latter case the claims in the letters patent are to be resorted to in order to ascertain whether the thing actually used is the thing comprehended within the fair scope of the claims.
When the letters patent issued to Gathmann (No. 763,387) are examined it is found that they refer to a “method of drying materials ” and the specification points out that in this art it had been common to make use of “ a closed circuit ” and the necessary apparatus, and further that to avoid certain injurious consequences, which more or less bulky materials are likely to suffer “ when subjected db initio to a vaporizing temperature,” it had been proposed to start the operation “by first producing a vapor-laden atmosphere * * * by causing the air in a closed circuit ” to absorb more or less steam while in circulation in said circuit, and finally this “ saturated air has been blown out of the circuit and fresh ambient air taken in,” the operation being repeated until the material is freed of its moisture and the latter blown off. Certain objections to this latter method are pointed out, and it is declared that “ in those processes which are based upon the circulation of the drying medium in a closed circuit and the condensing of the vapors no means have been provided to produce a vapor-laden atmosphere in the drying chamber.” The invention, it is declared, has for *317 its object the combination of the two methods mentioned. It is, and claims to be, a “ method patent. The specification in Gathmann’s Letters Patent admits the want of novelty-in the elements of the combination; and the changes in the application through the Patent Office, as shown by the file wrapper and contents made an exhibit to the findings, show that neither the method of drying by circulating the drying medium in a closed circuit nor the downward direction of the drying current was new or had the property of novelty.
After numerous amendments the Gathmann application was again reviewed by the examiner in the Patent Office in June, 1903, who, speaking of one of the claims much insisted on by the applicant, rejected the claim because “the downward direction of the drying current is notoriously old.” The fact must be conceded and accepted that a closed circuit comprising a drying chamber, a means of heating the air therein to a vaporizing temperature, a fan to cause or accelerate the circulation of the air or drying medium in circuit; a condenser to reduce the temperature of the heated air and thereby recover the solvent, or some of it, and help dry the powder, were all well known and had been in use, and the inquiry must be to ascertain what was the Gathmann method alleged to have been used by defendant. It must be disclosed in the- claims in the letters patent, because these are statutory requirements prescribed for the very purpose of making the patentee define precisely what his invention is, and it is unjust to the public, as well as an evasion of the law, to construe the claim in a manner different from the plain import of its terms. White v. Dunbar, 119 U. S. 47, 52; but as stated in the case just cited, the context may undoubtedly be resorted to and often is resorted to for the purpose of better understanding the meaning of the claim.
The method for reducing the solvent and drying the powder which defendant was using in 1900 was by.means of a closed-circuit apparatus, into which air was introduced, and was substantially as follows: The powder was placed into three separate containers, and these were connected severally by pipes to the closed circuit wherein the air was duly heated in a heating chamber and kept in circulation by a fan, thus projecting it downward through the *318 powder containers, upon leaving which the solvent-laden air passed into a condensing chamber, where, by a sudden change of temperature, it was relieved of its solvent vapors, or parts thereof, and the air passed on for a repeated circuit of the same kind of operation. This method of evaporating and saving a material portion of the ether and alcohol constituting the solvent was continued in use for perhaps a year, when it was abandoned on account of excessive leakage in the pipes caused by the great number of connecting joints necessarily employed in joining the various parts of the apparatus together to form the closed circuit.
The defendant used different devices after the one just mentioned, and if it be assumed that there was a contract between the parties the question would still be, did it use Gathmann’s method?
Claim one of the letters patent calls for “Producing a vapor-laden atmosphere in a space containing a substance to be dried,” and causing this vapor-laden atmosphere “ to flow downwardly through said space,” maintaining the circulation until the atmosphere is saturated with vapor, and then by lowering the temperature of said atmosphere during, its passage to cause a condensation and a consequent saving of the solvent. There is under this method an exclusion of ambient air. The method so described was to be effectuated by heating the powder so that the atmosphere above it in the powder chamber would become vapor-laden from the evaporation of the alcohol and ether in the powder mass. This being accomplished, tire vapor-laden atmosphere was caused to pass downward through the powder to the lower level, where the condensation occurs, as has been stated, and it then passed on in- the closed circuit to where it was taken up by the fan and projected into a heating device, whence it repeated its tour of the closed circuit. It was claimed that this method saved considerable amounts of the solvent as well as dried the powder quicker and to a more even degree. Gathmann claimed that by first obtaining a vapor-laden atmosphere in the space occupied by the powder to be dried he thereby maintained throughout its subsequent journeys in the closed circuit a degree of uncondensed volatiles within the said atmosphere which kept the powder moist, thus pre *319 venting a surface crust and drying it more thoroughly and ■evenly. Claim one, then, is limited, by reference to the claim and specification, to producing a vapor-laden atmosphere in the space occupied by the powder — the powder chamber. The defendant never at any time used such a method.
Claim two is much broader than claim one, and, unless read in connection with and in the light of the specification, comes within one or more of the rejections interposed by the Patent Office to some of the numerous amendments offered while •the application was in that office; and further, unless so read, the claim amounts to nothing more than what the specification declares at its outset, “ it has been common to make use of.” Either of those conditions is to be avoided in construing the claim.
The specification mentions two- familiar processes and that in neither of them has means been, provided “ to produce a vapor-laden atmosphere in the drying chamber.” It declares that the “ invention has for its object the combination of two described methods,” so improved as that “ a substantially vapor-saturated atmosphere in the drying chamber ” is maintained nearly to the end of the drying process. One of the principal advantages supposed to flow from the process was that the vapor-laden atmosphere would prevent the outside of the grains of powder from becoming encrusted and dried while the interior of the grain maintained a large amount of moisture.
Continuing its description, the specification describes the operation of the apparatus by reference to certain drawings, and states that after the substance to be dried has been placed in the drying chamber and “ the latter closed and cut out of the circuit by closing” a designated valve, “a vapor-satni-rated atmosphere is produced in the drying chamber,” which, it is stated, may be done in various ways. These ways are, first, by supplying heat to the heater condenser located under the drying chamber and heating the substance to be dried and the air in the drying chamber until the air has become' saturated, “or, in other words, to have reached the dew point,” and in the meantime heat is being applied to the heater located on the opposite side of the apparatus from the drying chamber, and having for its purpose the supplying *320 of beat to the atmosphere when the circulation through the closed circuit proceeds; or, second, by heating the substance to be dried until the air “ confined in the drying chamber is more or less laden with vapor,” and then reestablishing the circulation until the air “ becomes saturated with vapor, or, in other words, has reached the dew point;” or thirdly, by proceeding as described under first or second, and also injecting steam “into the drying chamber.”
While thus describing his process, the claims two, three, and four are for methods of drying in which an atmosphere “ saturated with vapor ” is produced before condensation is allowed to set in, the difference in the three claims consisting principally in the timé and place of producing the saturated atmosphere. In claim two the circulation is started and continued until there is a saturated atmosphere; in claim three the.drying medium is treated “while confined in the space containing the substance to be dried,” and then starting a circulation which is maintained until the drying medium is “saturated with vapor,” then reduced and condensed to an extent; and in claim four the drying medium is heated to a vaporizing temperature while confined in the drying chamber, then the “so-heated medium” is set in motion and allowed to condense on a lower level.
The medium which is thus heated to a vaporizing temperature while confined in the drying ehainber (according to claim four) is heated to a vaporizing temperature while in circulation (according to claim' two); and in claim two the circulation is maintained until the drying medium “ is saturated with vapor.” Then, and not until then, is any condensation allowed to take place. The specification and claim two, alike, call for a vapor-saturated atmosphere and the claim can not be read so broadly as to cover methods which omit some of its essential elements. The defendant’s box-type method used in 1910, or subsequently, did not seek to create or maintain an atmosphere saturated with vapor, or to cause the heated air to be fully or partially saturated with vapor when it entered the drying chamber. In the Government’s method there was no attempt to limit or to regulate the extent of condensation in order to maintain a saturated atmosphere. On the contrary, its method had the *321 purpose of extracting all the solvent that could be extracted,, as and when the medium passed through the condenser.
If, therefore, it be assumed that there were contractual relations between the parties, it can not be said that the Government used plaintiff’s method of drying powder. But, as already stated, there was no contract after the rejection of Gathmann’s proposal.
The petition should be dismissed. And it is so ordered.
Geaham, Judge; Hat, Judge, and DowNey, Judge, concur.